UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- vs -<br><br>RUBEN WEIGAND and<br>HAMID "RAY" AKHAVAN,<br><br>    Defendant. | No. 20-cr-0188 (JSR)<br><br>**FILED UNDER SEAL** |

**HAMID AKHAVAN'S RESPONSE TO THE GOVERNMENT'S SENTENCING
SUBMISSION AND LETTER REGARDING FORFEITURE**

William A. Burck
Derek L. Shaffer
Brian McGrail
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW #900
Washington, D.C. 20005
Telephone:  (202) 538-8000
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemanuel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figueroa St, 10th Floor
Los Angeles, CA 90017
Telephone:  (213) 443-3000
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Ira P. Rothken
Jared Smith
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net


Sara Clark
Quinn Emanuel Urquhart & Sullivan, LLP
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone:  (713) 221-7010
Email: saraclark@quinnemanuel.com


*Attorneys for Hamid "Ray" Akhavan*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...........................................................................................................................1

I.  All Parties Agree that the Guidelines Sentence Overstates the Seriousness of the
    Offense. ....................................................................................................................2

II. Significant Mitigating Factors Warrant a Lower Sentence.................................................7

III. Forfeiture Is Not Appropriate .........................................................................................9

    A.  Mr. Akhavan Did Not Obtain Any Proceeds ...........................................................9

    B.  The Proposed Forfeiture Violates the Eighth Amendment Prohibition
        Against Excessive Fines ......................................................................................12

CONCLUSION........................................................................................................................14

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*U.S. v. Abbott*,
   No. 19-CR-10117-IT, 2019 WL 4394934 (D. Mass. Sept. 13, 2019) ...................................... 4

*U.S. v. Bajakajian*,
   524 U.S. 321 (1998)...................................................................................................... 12

*C.f. Honeycutt v. U.S.*,
   137 S. Ct. 1626 (2017)..................................................................................................... 9

*U.S. v. Castello*,
   611 F.3d 116 (2d Cir. 2010) ............................................................................................ 13

*Dean v. United States*,
   137 S. Ct. 1170 (2017)..................................................................................................... 2

*U.S. v. Haaris*,
   2020 WL 5259927 (S.D.N.Y. Sept. 3, 2020)...................................................................... 11

*U.S. v. Haddock*,
   12 F.3d 950 (10th Cir. 1993) ............................................................................................ 4

*U.S. v. Ohle*,
   441 Fed. Appx. 798 (2d Cir. 2011) .................................................................................. 11

*U.S. v. Lumiere*,
   16 Cr. 483(JSR) (S.D.N.Y. June 27, 2017) ........................................................................ 2

*United States v. Leyva*,
   916 F.3d 14 (D.C. Cir. 2019) .................................................................................... 11, 12

*U.S. v. Malewicka*,
   664 F.3d 1099 (7th Cir. 2011) ......................................................................................... 13

*U.S. v. Peters*,
   732 F.3d 93 (2d Cir. 2013) ......................................................................................... 9, 10

*Rajaratnam v. United States*,
   736 Fed. Appx. 279 (2d Cir. 2018)................................................................................... 11

*U.S. v. Tanner*,
   942 F.3d 60 (2d Cir. 2019) ............................................................................................. 11

*U.S. v. Varrone*,
   554 F.3d 327 (2d Cir. 2009) ..................................................................................... 12, 13

*U.S. v. Viloski*,
   814 F.3d 104 (2d Cir. 2016) ..................................................................................... 12, 14

*SEC v. Metter*,
   706 Fed. Appx. 699 (2d Cir. 2017)................................................................................... 12

*U.S. v. $11,552.73 In United States Currency*,
   2009 WL 10708956 (D. Mass. Oct. 14, 2009) ................................................................... 13

**Statutory Authorities**

18 U.S.C. § 982(a)(2)...................................................................................................................... 9

**Additional Authorities**

Barack Obama, *Dreams from My Father: A Story of Race and Inheritance* (Three
   Rivers Press, 2004) ................................................................................................................... 7

U.S. Sentencing Guidelines Manual § 2B1.1(b)(2)(A)(i)............................................................ 3

U.S. Sentencing Guidelines Manual § 2B1.1(b)(17)(A)............................................................. 4

U.S. Sentencing Guidelines Manual § § 2B1.1(b)(1)(N)............................................................ 3

U.S. Sentencing Guidelines Manual § 2B1.1 cmt. N 3(B) ........................................................ 3

Defendant Hamid R. Akhavan respectfully submits this memorandum in response to the government's Sentencing Submission (ECF 311) ("Gov. Submission") and the government's Letter regarding forfeiture (ECF 313) ("Forfeiture Letter").

## PRELIMINARY STATEMENT

This is not a case about greed—Mr. Akhavan has gained nothing, and he has lost everything.  In the course of doing so, he has caused no harm except to himself.  The circumstances of the crime, Mr. Akhavan's addiction, and the financial ruin this case has already wrought on him and his family weigh strongly against a prison term longer than that Mr. Akhavan has already served.  And yet, despite all this, the government attempts to paint Mr. Akhavan as a mob boss, lording over a criminal empire that simply does not exist.  The alleged co-conspirators and so-called "victims" are sophisticated public companies and international banks that all profited from the transactions at issue.  Undeterred by the facts, the government seeks the forfeiture of $156 million—a number untethered to any sum of money Mr. Akhavan has ever controlled, and which, if imposed, would violate Mr. Akhavan's Eighth Amendment right to be free from excessive fines—on top of what the government characterizes as a "substantial" term of imprisonment.  The government seems bent not only on punishing Mr. Akhavan for the crime of conviction, but on depriving him of any future.  Such excessive punishment is neither appropriate nor necessary here, and should be not be imposed.

## ARGUMENT

While admitting that no one lost any money and that the Guidelines overstate the severity of the offense of conviction, the government nevertheless clings to the PSR's Guidelines calculation in hopes of securing a "substantial" term of imprisonment, while simultaneously attempting to portray Mr. Akhavan, who is nearly bankrupt, as a leader of an organized crime syndicate.  But, for all its hyperbole, the government falls short.  The Guidelines calculation is

flawed: there was no loss to any party, no victims, and no gain for Mr. Akhavan. An offense for which harm was never intended nor occurred, Mr. Akhavan's personal background, and his addiction counsel against any significant additional term of incarceration, especially in light of the time that Mr. Akhavan has already served. In a similar vein, an order of forfeiture is inappropriate in this case where Mr. Akhavan never actually controlled any of the funds at issue, and the sum the government seeks raises serious constitutional concerns.

## I.     All Parties Agree that the Guidelines Sentence Overstates the Seriousness of the Offense.

The government and probation acknowledge that the Guidelines calculation substantially overstates the seriousness of Mr. Akhavan's conduct. This is due, in significant part, to the 26 level enhancement applied for "loss" that the government alleges Mr. Akhavan caused to the Issuing Banks,[1] and related enhancements for derivation of receipts and number of victims. PSR ¶¶ 47-51 , Gov. Submission, p. 7. The government admits that "the defendant's Scheme ***did not result in Issuing Banks losing money*** on the Eaze transactions." Gov. Submission, p. 8. Yet, rather than take a rational approach to determining a reasonable sentence that is "sufficient, but not greater than necessary," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017),[2] the government stands by the erroneous Guidelines calculation, and seeks a "substantial term of

---

[1]    As this Court has recognized, the "draconian penalties" that result from extreme loss enhancements "bear no relationship . . . to any of the factors set forth in Section 3553(a): just punishment, the nature of the person's offense, and the nature of the person's character, the need for specific and general deterrence." Sentencing Tr., *U.S. v. Lumiere*, 16 Cr. 483 (JSR) (S.D.N.Y. June 27, 2017) (ECF 115, Tr. at 27:24 – 28:24). That is certainly the case here.

[2]    Unless otherwise noted, internal citations, quotation marks, and alterations have been removed from citations in this brief.

imprisonment."[3]  Gov. Submission, p. 1.

The PSR's Guidelines calculation, which the government endorses, proceeds from three fundamentally flawed premises, each of which the government reiterates in its Submission.

The first and most glaring of these flawed premises is that there should be 26 level enhancement for loss.  As the government now concedes, there was no loss to the banks—the $156,225,211.16 is the total transaction volume *processed*.   Gov. Submission, p. 8 Notwithstanding the government's conflation of transaction volume with loss, as a matter of law and logic the value of transactions processed does not equate to *pecuniary harm* such that a corresponding enhancement under U.S.S.G. § § 2B1.1(b)(1)(N) is appropriate.  *See* Akhavan Sentencing Submission (ECF 312) ("Akhavan Submission") §II.A.

The government seems to recognize the hole in its argument, belatedly attempting to conjure harm out of the Issuing Banks' investment in general fraud detection.  Gov. Submission, p. 8.  This is a red herring because the Issuing Banks' fraud expenditures are unrelated to marijuana transactions.  The government cites Citi's $280 million anti-fraud budget, but fails to note that Citi's witness testified that Citi allocates *zero dollars* of that budget to ferreting out marijuana fraud.  Tr. 2161:2-12 (Steinbach) (A. There are no programs designed to identify a marijuana transaction; is that what you're asking? Q. Yes. A. No, there's not. Q. And the 278.9, or 276.9 million dollar budget which you talked about, the $18 million technology, how much of that would you say is dedicated to ferreting out or identifying marijuana sales?[. . . ] A. None.).  Of course, with no loss, there can be no victims, making that 2 level enhancement likewise inapplicable.  *See* Akhavan Submission § II.B.; U.S.S.G. §2B1.1(b)(2)(A)(i).

---

[3]   The government does not elaborate on what is considers substantial.  The defense submits that the nearly 8 months Mr. Akhavan has already served in confinement is itself substantial, and justice does not warrant any further penalty.

Importantly—and to address the precise question posed by the Court's Order of June 15, 2021 (ECF 315)—this is ***not*** a case contemplated by application note 3(B), where there was a loss, but that loss is difficult to calculate. *See* U.S.S.G. 2B1.1 cmt. n. 3(B). This is a case where there has been absolutely *no showing of actual or intended pecuniary harm to any party* whatsoever—even the government concedes the Issuing Banks did not lose any money on the transactions, Gov. Submission, at p. 8, and there is no record support for any other economic harm. For this reason, it would likewise be inappropriate to substitute gain for loss. *See U.S. v. Haddock*, 12 F.3d 950, 960–61 (10th Cir. 1993) ("The defendant's gain may be used only as an alternative estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims.").

The second and equally flawed premise is that Mr. Akhavan was personally enriched from the scheme. The evidence does not show Mr. Akhavan ever received a dime. The funds released by the Issuing Banks passed to Visa and MasterCard, the merchant/acquiring banks in Europe, to the dispensaries, and finally Eaze itself would take its cut. None of those funds are properly characterized as gains to Mr. Akhavan, making an enhancement under §U.S.S.G. § 2B1.1(b)(17)(A) inappropriate, and underscoring why substituting gain for loss is not viable. *See U.S. v. Abbott*, No. 19-CR-10117-IT, 2019 WL 4394934, at *3 (D. Mass. Sept. 13, 2019) ("[E]ven assuming that there is a pecuniary loss that reasonably cannot be determined, the record does not support the government's argument that the amounts paid by the Defendants are 'gains' under the Guidelines. Certainly, the Defendants before the court did not 'gain' these amounts, but instead paid them to a co-conspirator. Nor did the conspiracy as a whole gain these moneys. Instead, the amounts were passed between the co-conspirators, and cannot stand in as an alternative measure for any loss incurred by the universities or testing companies.").

4

Though the government seeks to impute the full value of the processing fees to Mr. Akhavan, those fees were charged by the processing intermediaries, Clearsettle and EU Processing, and take into account sums retained by Visa and Mastercard and the Issuing Banks— there is nothing in the record showing those fees inuring to Mr. Akhavan's benefit. *See, e.g.*, Tr. 1615:7 – 1616:9) (Patterson explaining he does not know how the processing fees were distributed); 1660: 3-24 (Patterson explaining that the intent was for all entities in the processing system to receive their allotted fees); 2098: 18-22 (Steinbach noting Citi's fees of approximately 1.8% of each credit card transaction); 506:1 – 507:7 (Verdeschi explaining Mastercard's transaction fees).

The government's only "evidence" on this point is a spreadsheet from the co-defendant's laptop that reflects "shares" allocated to "Jaw13/Senjo,"[4]—a document no witness explained. And, though documents introduced at trial suggested the amounts reflected in Exhibit 1518 were transferred in their entirety to an entity described as "Senjo Payment Asia PTE Limited," *see e.g.*, Tr. 1426:9-20, Tr. 13294:5-10; 15-25, there was no evidence of what Senjo Payment Asia PTE Limited was, why it was receiving transfers, nor on whose behalf—indeed, Senjo did not otherwise come up at trial, much less in a way that would suggest Mr. Akhavan received funds transferred to that entity. Certainly no testimony linked any actual funds back to Mr. Akhavan or any entity he controlled.[5]

Finally, the government continues to inaccurately paint Mr. Akhavan as a greedy mob boss. That image is belied by the undisputed facts in this case. Mr. Akhavan had no need to

---

[4]   Notably, the government does not rely on this spreadsheet in calculating the co-defendants' payments under the scheme.

[5]   What the apparent "share" allocation actually represents, how it was calculated, and what came of the amounts apparently wired to Senjo are unknown.

make money from Eaze[6]—the same evidence the government relies on in its submission, in fact, suggests he lost money on the scheme.  Gov. Submission, p. 8; Tr. 1548 (message from Mr. Akhavan to Eaze's CEO stating "I've lost tons of money working with you.").  Further, Mr. Akhavan did not manage and control every aspect of the scheme—*Eaze employees* interfaced directly with the payment processors.  Tr. at 2032:7 – 2033:2.  Mr. Akhavan's role was primarily related to making introductions, explaining how processing worked, and troubleshooting for the processors and Eaze.   While there was evidence that Mr. Akhavan acted as a point of communication between Eaze and the various processors in Europe, it was *Eaze* that continued to push for a processing solution.  Akhavan Submission, §II.D.  That Mr. Akhavan diagrammed and explained how things worked does not, contrary to the government's interpretation, make him the equivalent of a puppeteer, much less a cartel leader.  *C.f.*, Tr. at 710 (describing Mr. Akhavan having meetings), 726-727 (describing Mr. Akhavan and Mr. Hargreaves diagramming a processing solution), (1560) (describing Mr. Akhavan explaining processing), 1838-39 (describing Mr. Akhavan explaining risk to Eaze and its dispensary representatives).[7]

Correcting these three flawed premises reduces the Guidelines calculation by 34 levels, and the Guidelines sentence from life to 4-10 months—a term Mr. Akhavan has largely already served under extremely difficult circumstances during the COVID-19 pandemic.  To the extent the Court's sentence reflects the Guidelines at all, Mr. Akhavan submits that the appropriate reference is this lower range.

---

[6]   Mr. Akhavan's past earnings, as reflected in his tax returns, are traceable to unrelated, legal business enterprises and have no relevance to the Eaze project.

[7]   That Eaze employees unfamiliar with credit card processing believed Mr. Akhavan to be "in charge of" or "the same as" the EU bank ClearSettle is not only unsupported, by the record, but contradicted by the government's own evidence that Mr. Akhavan was not part of ClearSettle.  Tr. 698:14-15 (noting that Clearsettle was owned by a man named Ozan Ozerk); Ex. 1572 (Clearsettle organizational chart).

## II.    Significant Mitigating Factors Warrant a Lower Sentence

Contrary to the government's position, Mr. Akhavan's case presents significant mitigating factors that favor a lesser sentence.  As set forth in detail in Mr. Akhavan's prior submission, and revisited above, this is a unique case involving neither actual or intended loss, nor enrichment of the defendant.  Akhavan Submission § IV.A.  Mr. Akhavan is not now and never has been a threat to the public, *see id.*, and the personal and financial ruin Mr. Akhavan has suffered already is a sufficient deterrent to future criminal activity.  He has served more than seven months in extremely restrictive confinement.   Whatever flippancy the government perceives in his prior attitude toward the law (influenced, as much of his activity was at the time, by his addiction), Mr. Akhavan has been severely punished for his mistakes, and chastened by the harsh conditions he has endured.  *See id.*

Further, the goal of general deterrence has been served.  Eaze no longer has access to its last credit card processor, and entrepreneurs in the space are unlikely to be willing to take the risks Mr. Akhavan (and subsequent processors) took, for fear of similar prosecution.  *See  id.*

The government dismisses Mr. Akhavan's addiction, proposing that because Mr. Akhavan was previously able to maintain a lucrative business, he must have no issues worthy of the Court's consideration.[8]  That Mr. Akhavan may have been a high-functioning addict at one time does not lessen the severity of his condition.  As detailed in his submission, it is precisely Mr. Akhavan's experience with and addiction to drugs that caused him to engage with the Eaze

---

[8]    It is no secret that even the most successful individuals can be ruined by drug addiction. Even former President Barack Obama admitted in his memoir to self-medicating with drugs and alcohol, and indicated he was heading down a dangerous path as a result.  Barack Obama, DREAMS FROM MY FATHER: A STORY OF RACE AND INHERITANCE 93 (Three Rivers Press, 2004) ("Pot had helped, and booze; maybe a little blow when you could afford it.").  Sadly, not all are able to as quickly and completely right the ship.  Charlie Sheen, Judy Garland, Whitney Houston, Allen Iverson, Robert Downey Jr., Elton John and Steve Howe are a few well-known, successful individuals who have struggled with, and in some cases lost their battles to, addiction.

project in the first place.  Akhavan Submission, § I.B.  Tragically, his addiction has clouded his judgment, and since derailed both his personal and professional life.  Akhavan Submission, § I.B.

His addiction has also led Mr. Akhavan to make mistakes since his arrest.  The government strains to paint a picture of Mr. Akhavan as a hardened criminal.  But he is nothing of the sort.  As described in detail by Mr. Akhavan's wife, ████████████████████████████ ████████████████████████████[9]  Akhavan Submission §I.B, Ex. 2.  Mr. Akhavan is not and has never been violent toward anyone.[10]  Prior to the last few years, he was just the opposite.  He was the person others relied on for help, and he placed family above all else.  Akhavan Submission §I.B, Ex. 2.  Nor should Mr. Akhavan's treatment efforts, imperfect though they may be, be used against him to paint him as a recidivist.  To be sure, Mr. Akhavan needs (and wants) treatment for his addiction.  He needs and wants to begin to rebuild his life, and reconnect with his family.  But he does not need more time in prison.

---



[9]  As set forth in Nina's letter, ████████████████████████████████████ ██████████████████████████████████

[10]  That the government discredits Mr. Akhavan's explanation ██████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████  Mr. Akhavan's conduct was never ill-intended.

### III.      Forfeiture Is Not Appropriate

In its Indictment, the government sought forfeiture of "proceeds traceable to the commission" of the offense of conviction.  The government has since abandoned the idea that it might trace any proceeds or property derived therefrom to Mr. Akhavan (because none exist), and now seeks to punish Mr. Akhavan to the tune of $156,225,211.61, atop his prison sentence. Far from being "proceeds," this is the total amount of processed transactions on which all parties agree, no one lost any money (except for perhaps Mr. Akhavan).  Tr. 1659:23 – 1660:24; 1548:17.  Further, Mr. Akhavan never "acquire[d] or control[led]" these sums such that he should be liable to forfeit them.

The government's interpretation of the law governing forfeiture is out of step with governing case law.  Like its sentencing recommendation, the forfeiture proposal fails to serve any legitimate governmental interests—it will neither "separat[e] a criminal from ill-gotten gains" (because there are not any), "return property . . . to those wrongfully defrauded" (because there is no one to "return" anything to), nor "lessen the economic power of criminal enterprises (as there is no enterprise to weaken). *C.f. Honeycutt v. U.S.*, 137 S. Ct. 1626, 1631 (2017); Forfeiture Letter, p. 1.  It is excessively punitive, violates Mr. Akhavan's rights under the Eighth Amendment, and should be rejected.  *U.S. v. Peters*, 732 F.3d 93, 98–99 (2d Cir. 2013) ("A court's discretion in ordering criminal forfeiture is cabined by the Eighth Amendment's Excessive Fines Clause.  The amount of forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.").

### A.      Mr. Akhavan Did Not Obtain Any Proceeds

Under section 982(a)(2), a court "shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained directly or indirectly, as the result of such violation."  18 U.S.C. § 982(a)(2).  In construing a materially identical statute,

the Supreme Court made clear that the "adverbs 'directly' and 'indirectly' modify—but do not

erase—the verb 'obtain.'   In other words, these adverbs refer to how a defendant obtains the

property; they do not negate the requirement that he obtain it at all." *Honeycutt*, 137 S. Ct. at

1633.

The government recognizes the statute's requirement of personal control, Forfeiture

Letter, p. 1, n.1, but attempts to equate the Eaze scheme with hierarchical, centralized criminal

organizations like drug cartels.   But, as the Court is well aware, that is not what the evidence

showed in this case.   Eaze employees, the dispensaries, and other scheme participants are not

akin to Mr. Akhavan's employees or subordinates—Eaze was, at most, a client of Mr.

Akhavan's.   Tr. 706:20-22; 1479:11-15.   And Mr. Akhavan did not "control" other scheme

participants.   Neither the processors, merchant/acquiring banks, nor the dispensaries answered to

him, and he did not have ultimate control over funds that flowed to them as a result of the alleged

scheme.   Even to the extent Mr. Akhavan was involved in opening accounts, there was no

evidence that he ever exercised any control over those accounts—indeed, it was Eaze and the

dispensaries which ensured that the accounts properly mapped to the dispensaries.[11]   Once set up,

funds flowed through the card processing system, from the Issuing Banks to Visa and

Mastercard, to the European merchant banks, through the merchant bank accounts, and finally to

the dispensaries and Eaze, with each party taking their cut.   Tr. 1659:23 – 1660:24.   Mr.

Akhavan did not "obtain" the $150 million that was transacted; and there is no evidence that the

---

[11]   The government spent significant time at trial attempting to show how the merchant accounts
mapped to the Eaze dispensaries.  This evidence underscores that Mr. Akhavan did not and could
not control the flow of funds once a transaction was authorized.  In this case, money went to the
merchant banks and ultimately to the dispensaries without Mr. Akhavan's intervention.  As a
result, it cannot be said that money that flowed to these entities was "effectively under the
control" of Mr. Akhavan.  *Peters*, 732 F.3d at 103.

flow of funds ever made its way to Mr. Akhavan, nor that he could have diverted them to himself or any third party.[12]

The government's reliance on *Tanner* is misplaced.  There, the Second Circuit held that "when each co-conspirator acquired the full proceeds 'as a result of the crime,' each can still be held liable to forfeit the value of those tainted proceeds, even if those proceeds are no longer in his possession because they have been "dissipated or otherwise disposed of by 'any act or omission of the defendant."  *U.S. v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019).  But as the plain text of section 982(a)(2) makes clear (and *Honeycutt* confirms), the defendant must still *obtain* the property for it to be subject to forfeiture.  Unlike the defendants in *Tanner*, Mr. Akhavan did not disperse the $156 million to his co-conspirators because he never obtained it to begin with.  Indeed, *Tanner* itself reaffirmed that *Honeycutt* does not permit forfeiture of proceeds that, as in this case, the defendant "never possessed."[13]  *See id.*

*United States v. Leyva*—also cited by the government—is similarly inapposite.  916 F.3d 14 (D.C. Cir. 2019).  *Leyva* described a pre-*Honeycutt* exception to the general forfeiture rule

---

[12]   The government goes to great lengths to explain how knowledgeable Mr. Akhavan was about the payment processing solution he proposed for Eaze.  But, no amount of white-boarding, lecturing, attention to customer service, or feedback regarding websites provided Mr. Akhavan with control over the funds the Issuing Banks placed into the payment processing system when they authorized the transactions at issue in this case.  The government's allegations, even taken at face value, still fall short of demonstrating any time when Mr. Akhavan controlled or directed the disposition of any of those funds.  Such a showing is insufficient to show that Mr. Akhavan "extensively controlled or dominated" the accounts, "such that he can be said to have acquired the funds contained therein."  *See U.S. v. Haaris*, 2020 WL 5259927, at *6 (S.D.N.Y. Sept. 3, 2020) (Rakoff, J.) (declining to impose forfeiture in a health care fraud case).

[13]   Many of the cases cited by the government are inapposite for similar reasons.  In *Rajaratnam v. United States*, 736 Fed. Appx. 279, 284 (2d Cir. 2018), the defendant obtained the property and "subsequently distributed it to investors."  *Rajaratnam* does not apply because Mr. Akhavan never obtained the property at issue.  Similarly, Mr. Akhavan does not argue that he "only be required to forfeit fraud proceeds that he personally kept."  *U.S. v. Ohle*, 441 Fed. Appx. 798, 803 (2d Cir. 2011).  Rather, Mr. Akhavan's argument is that he *never obtained* the property at issue at all.

based on the theory that "property obtained 'indirectly' might include 'property received by persons or entities that are under the defendant's control,' such as 'an employee or other subordinate of the defendant.'" *Id.* at 30. Regardless of whether the Second Circuit would recognize a similar exception after *Honeycutt*, the principle does not help the government here because no "subordinate or employee" of Mr. Akhavan obtained these funds—rather, they were split amongst the independent parties involved in the processing, including the Issuing Banks themselves.[14]

### B.     The Proposed Forfeiture Violates the Eighth Amendment Prohibition Against Excessive Fines

Finally, a forfeiture of over $150 million would be unconstitutional.   Forfeiture is unconstitutionally excessive if "it is grossly disproportional to the gravity of a defendant's offense." *See U.S. v. Bajakajian*, 524 U.S. 321, 333-34 (1998); *see also U.S. v. Varrone*, 554 F.3d 327, 331 (2d Cir. 2009). To decide whether forfeiture is "grossly disproportional" the court should weigh four factors "[1] 'the essence of the crime' of the [defendant] and its relation to other criminal activity, [2] whether the [defendant] fit into the class of persons for whom the statute was principally designed, [3] the maximum sentence and fine that could have been imposed, and [4] the nature of the harm caused by the [defendan''s] conduct." *Varrone*, 554 F.3d at 331. Additionally, the Second Circuit has stated that district courts should examine whether a fine would be so onerous as to "deprive a wrongdoer of his livelihood." *U.S. v. Viloski*, 814 F.3d 104, 111 (2d Cir. 2016) (quoting *Bajakajian*, 524 U.S. at 335).

---

[14]   *SEC v. Metter* is even farther off point. 706 Fed. Appx. 699 (2d Cir. 2017). There, the Second Circuit "decline[d]" the defendant's "invitation to extend the Honeycutt holding with respect to forfeiture under § 853 to the context of the equitable remedy of disgorgement." *Id.* at 702 n.2. The Second Circuit also held that the defendant could not "deny" that he personally "controlled" a corporation that received assets from a fraudulent scheme. *Id.* at 702. There is no analogous corporation holding assets in this case.

Each of the factors weighs against the imposition of such excessive forfeiture here.

**Essence of the Crime.**   The first of the factors focuses on whether the nature of the defendant's crime, including whether it was related to, or intended to cover up, another.  *See Varrone*, 554 F.3d at 331; *U.S. v. Castello*, 611 F.3d 116, 121–22 (2d Cir. 2010) ("Castello's crime is far more serious than Bajakajian's. Castello['s failure to file thousands of CTRs] enabled his customers to commit various acts of fraud, whereas Bajakajian committed a single offense, once, for a purpose that was not nefarious.").  Mr. Akhavan was intending no harm and no crime; his actions were unrelated to any other criminal endeavor, and he was certainly not attempting a cover up.

**Targeted Class.**   Mr. Akhavan provided payment processing for a nascent and legally uncertain industry.  Mr. Akhavan is not a typical bank fraud defendant for the simple reason that the alleged scheme, by its very nature, was intended to ensure all parties were paid in full.

**Maximum Fine.**   The government seeks forfeiture in an amount that is ***156 times*** the statutory maximum fine of $1,000,000.00.   The government is only entitled to "a strong presumption of constitutionality where the value of a forfeiture falls within the fine range prescribed by Congress or the Guidelines." *U.S. v. Malewicka,* 664 F.3d 1099, 1106 (7th Cir. 2011) (citation omitted).  Here, the fine is grossly out of step with the maximum.  *See Varrone*, 554 F.3d at 331–32 (declining to presume a forfeiture amount forty times the maximum fine was constitutionally permissible).

**Nature of the Harm.**   As explained above and in his initial submission, Mr. Akhavan neither intended nor actually caused any harm to any participate in the transactions.  *See U.S. v. $11,552.73 In United States Currency*, 2009 WL 10708956, at *5 (D. Mass. Oct. 14, 2009) (finding, in support of defendant's Eighth Amendment claim, that while the defendant's fraud

13

had prevented the Post Office from fulfilling its reporting requirements, the "Post Office suffered [no] adverse consequences as a result of the [defendant's] structuring").

***Deprivation of Livelihood:***   Such an award would certainly destroy Mr. Akhavan's livelihood.  *See Viloski*, 814 F.3d at 111. As described in detail, as a result of his addiction and this prosecution, Mr. Akhavan has already lost everything.  A forfeiture order on the magnitude proposed by the government would certainly ensure neither he nor his loved ones ever recover from this case.

## CONCLUSION

For the foregoing reasons, Mr. Akhavan requests the Court impose a sentence of no more than the time he has already served, and that the Court decline the government's invitation to impose a constitutionally infirm forfeiture order.

*       *       *

*[Remainder of page intentionally blank]*

June 15, 2021

ROTHKEN LAW FIRM

*/s/ Ira Rothken*
Ira Rothken
Jared Smith
3 Hamilton Landing
Suite 280
Novato, CA 94949
Telephone: (415) 92404250
Email: ira@techfirm.net
Email: jared@techfirm.net

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

*/s/ William A. Burck*
William A. Burck
Derek L. Shaffer
Brian McGrail
1300 I St. NW #900
Washington, DC 20005
Telephone: (202) 538-8000
Fax: (202) 538-8100
Email: williamburck@quinnemanuel.com
Email: derekshaffer@quinnemauel.com
Email: brianmcgrail@quinnemanuel.com

Christopher Tayback
Mari Henderson
865 S Figueroa Street 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
Email: christayback@quinnemanuel.com
Email: marihenderson@quinnemanuel.com

Sara C. Clark
711 Louisiana St., Ste. 500
Houston, Texas 77002
Telephone: (713) 221-7000
Fax: (713) 221-7100
Email: saraclark@quinnemanuel.com